Sandra HOMAN and Kevin
Scott, Plaintiffs,

v.

CITY OF READING, Board of Health of
the City of Reading and Council of the
City of Reading, Defendants.

Civil Action No. 96–7782.

United States District Court,
E.D. Pennsylvania.

July 29, 1998.

Robert T. Vance, Jr., Philadelphia, PA, for Plaintiffs.

David J. MacMain, Michael J. Tierney, Montgomery, McCracken, Walker & Rhoads, L.L.P., Philadelphia, PA, for Defendants.

## MEMORANDUM AND ORDER

JOYNER, District Judge.

Plaintiffs Sandra Homan and Kevin Scott ("Homan" and "Scott" respectively, or "Plaintiffs" collectively) brought this action against Defendants City of Reading (the "City" or "Defendant"), Board of Health of the City of Reading (the "Board"), and Council of the City of Reading (the "Council")[1] seeking compensatory and punitive damages and injunctive relief pursuant to 42 U.S.C. §§ 1982 and 1983. Presently before the Court is Defendant's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

Plaintiffs allege the following facts. Homan, a Caucasian woman, and Scott, an African–American man, have lived together as common law husband and wife for the past nineteen years.

Sometime prior to May, 1996, Scott purchased the property at 1112–1134 Moss Street, Reading, Pennsylvania, at a tax sale and had the deed recorded in Homan's name. Scott remains the "beneficial owner" of this

---

**1.** Plaintiffs previously stipulated to the dismissal of the Board, the Council and Count II of the Complaint. Thus "Defendant" as used in this Memorandum refers only to the City of Reading.

property. Compl., ¶ 4. On May 25, 1996, the building (the "Warehouse") located on the premises was substantially destroyed in a fire. On or about May 28, 1996, Homan was served with notice (the "Board Order") that the Council, acting as the Board of Health, had declared the Warehouse a public nuisance and directed that the structure be rehabilitated or demolished within thirty days. That same day, Homan was also served with notice that Ronald E. Miller, Director of Community Planning, Programming and Development, had determined that the Warehouse constituted a public nuisance under the Property Rehabilitation and Maintenance Code ("PRMC"). On June 3, 1996, Homan, through her counsel, appealed both decisions.

Shortly after the receipt of both notices, Scott attempted to gain access to the Warehouse property in an effort to demolish the remaining structure and to clear the site of rubbish and debris. Scott, however, was "denied access to the Warehouse property by the City." *Id.* at ¶ 15. When he finally gained access to the property on June 27, 1996 [2]—two (2) days before the expiration of the thirty day abatement period—Scott hired a fence contractor to install a fence around the property and rented dumpsters for the debris from the demolition and clean-up. The Reading City Engineer ordered Scott to remove the dumpsters sometime after June 27, 1996. The fence was ordered removed, Plaintiffs allege, by a City official "sometime after June 20, 1996." *Id.* at ¶ 18. Plaintiffs did not obtain any permits to perform the demolition work.

The Council held hearings on Homan's appeals on June 10 and 18, 1996. On July 8, 1996, the Council, "per se and as [the Board]," issued its "Findings of Fact, Conclusions of Law and Decision," in which it sustained Homan's appeal of the Miller Order but denied her appeal of the Board Order.[3] Shortly thereafter, the Council awarded an $87,000 contract to Northeast Industrial Services Corp. to demolish the Warehouse. Demolition was completed in September, 1996.

The City intends to recover the cost of demolition of the Warehouse from Plaintiffs pursuant to 53 Pa.Con.Stat.Ann. § 37324. Plaintiffs' estimate that the work could have been completed for $10,000, and that they would have done so had the City not prevented them.

Based on this alleged series of events, Plaintiffs' claim that the City, through the Board and the Council, violated their rights to procedural due process. Plaintiffs also allege that, in denying them access to the property until June 27, 1996, the City violated their substantive due process rights by discriminating against Scott based on his race and against Homan based on her relationship with Scott. Thus, in Count I, Plaintiffs seek compensatory and punitive damages pursuant to 42 U.S.C. § 1983 and attorney's fees pursuant to 42 U.S.C. § 1988.

Plaintiffs make the following additional factual allegations in Count III. The City, through its Codes Services Unit, issued three "Non–Traffic Citations" to Homan for city ordinance violations in March and April of 1995. Across the street from Plaintiffs' residence, however, is a building (the "American Chain Building") owned "by a corporation controlled by a White person" which has never been cited for similar ordinance violations or declared a public nuisance despite being "in far worse physical condition than the [Warehouse] prior to the fire." Compl., ¶ 37. Plaintiffs attribute the allegedly differential treatment to "defendants' policy, custom and/or practice of racial discrimination in the enforcement of local law." *Id.* at ¶ 40. Thus, in Count III, they seek compensatory and punitive damages and attorney's fees pursuant to 42 U.S.C. §§ 1983 and 1988 for alleged violations of the Equal Protection Clause of the Fourteenth Amendment.

Finally, Plaintiffs incorporate all of their allegations into Count IV, in which they seek damages and injunctive relief pursuant to 42

---

**2.** Plaintiffs state in the answer to Defendant's motion for summary judgment that they were allowed on the property on June 20, 1996. (Pl.'s Mem. at 4).

**3.** The Council ruled that Miller lacked the authority to declare the property a public nuisance.

U.S.C. § 1982, and attorney's fees under § 1988.

At the outset we note that Plaintiffs' complaint alleges only race as the underlying improper motive to support these claims. However, Plaintiffs continue to argue in their responses to Defendant's motions that other improper motives, such as Defendant's desire to obtain the property in question for use as a parking lot, underlie the Defendant's actions. We stated—twice—in the prior 12(b)(6) Memorandum that if Plaintiffs wished to pursue this new theory, they would need to so amend the complaint. *See* 963 F.Supp. 485 at 489–90 and n. 4. However, Plaintiffs chose not to amend the complaint. Thus, we will not consider any such claims in determining this summary judgment motion. *See Bello v. Walker*, 840 F.2d 1124, 1130 (3d Cir.1988) (not considering a claim that was not plead).

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, reveal no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). Our responsibility is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The presence of "a mere scintilla of evidence" in the nonmovant's favor will not avoid summary judgment. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir.1989) (citing *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505). Rather, we will grant summary judgment unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

In making this determination, all of the facts must be viewed in the light most favorable to the non-moving party and all reasonable inferences must be drawn in favor of the non-moving party. *Id.* at 256, 106 S.Ct. 2505. Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material fact, the non-moving party must establish the existence of each element of its case. *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir.1990) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

### II. *Section 1983 Claims*

#### A. *Count I: Due Process*
##### 1. *Procedural Due Process*

The Third Circuit has instructed that "[t]o establish a cause of action for a violation of procedural due process, a plaintiff [must prove] that a person acting under color of state law deprived [him or her] of a protected interest [and] that the state procedure for challenging the deprivation does not satisfy the requirements of procedural due process." *Midnight Sessions, Ltd. v. City of Philadelphia*, 945 F.2d 667, 680 (3d Cir.1991). A property interest protected by the due process clause results from a " 'legitimate claim of entitlement' created by an independent source such as state law." *Id.* at 679 (quoting *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)). If such a property interest is deprived, due process requires notice and a meaningful opportunity to be heard. *Id.* at 680.

Plaintiffs argue that they were denied procedural due process in Defendant's failure to 1) stay the abatement period pending Plaintiffs' appeal of the public nuisance status under the PRMC and 2) allow Plaintiffs access to the property during the 30–day abatement period. We previously determined that Plaintiffs had a property interest in access to the property during the 30–day abatement period. *See* 963 F.Supp. at 488–89.

##### a. *Stay of the Abatement Period*

Plaintiffs argue that the abatement period should have been stayed because § 1181.13(f) of the PRMC provides that the abatement period shall be automatically stayed if an appeal is taken, except in cases of emergency. The City argues that the PRMC's automatic stay provision is inappli-

cable to this case as it was mooted by the Council's determination that the acting official, Miller, did not have statutory authority to declare the property a nuisance under the PRMC. We agree.

Plaintiffs' property was declared a public nuisance both under the PRMC and by the Council acting as the Board of Health. However, Plaintiffs agreed to appeal both the Board's determination and the PRMC determination in the same proceeding. While the PRMC decision was invalidated, the Board's declaration of the property as a public nuisance was upheld. Thus, even if the PRMC provision had worked to stay the 30–day period pending appeal of the PRMC determination, the 30–day period associated with the Board's decision was not stayed, making Plaintiffs' argument concerning stay of the 30–day period under the PRMC moot. *See* 53 P.S. § 37324 (abatement period stayed automatically only if there is an appeal to the court with proper bond posted).

Plaintiffs could have requested a stay under the Board's determination of the property as a public nuisance. *See* 53 P.S. § 37322(7) (persons affected may request stay of execution). However, there is no evidence that Plaintiffs requested such a stay. The Board suggested to Plaintiffs' attorney at the June 10, 1996, proceeding that he provide the Board with any authority concerning a stay of the proceedings at the next proceeding—June 18, 1996. There is no evidence presented that Plaintiffs ever referenced 53 P.S. § 37322 or requested a stay under these provisions.[4]

### b. Denial of Access

■ Plaintiffs' second argument is that they were denied procedural due process in the alleged denial of access to the property during most of the 30–day abatement period.[5] Plaintiffs argue that they were denied access to the property until June 20 or 27,

1996, and that there was no mechanism whereby they could challenge this denial of access. Defendant responds that Plaintiffs were allowed access to the property.

Statements by the City's attorney, Jack Linton ("Linton"), and the President of the Board of Health, Paul J. Hoh ("Hoh"), at the June 10, 1996, Board of Health Appeal Hearing establish that, as of that date, Plaintiffs had not been allowed access to the property. *See* (Transcript of Appeal, June 10, 1996, at 16–19). Further, the Council indicated that they had no power over whether Plaintiffs were allowed access to the property for any reason other than to collect evidence for the pending appeal and suggested that Plaintiffs' attorney try to gain access to the property through off the record discussions with Linton. *Id.* at 15–17. When asked if Plaintiffs could be allowed access to the property, Linton replied, "[w]e can see—obviously, we want to check on the safety issue, among others." *Id.* at 18. Linton further stated "[w]e have no problem doing that [allowing them on the property]. I think, obviously, if we've ordered them to clean up and rehabilitate we have to give them access to do that. But they're under certain conditions and that's what we need to discuss." *Id.* at 19. These statements create a genuine issue of material fact as to whether there was an adequate procedure for challenging the denial of access.

Therefore, Defendant's motion for summary judgment on the procedural due process claim is granted as to the stay of the abatement period based on the PRMC provision and denied as to the procedural due process claim regarding denial of access to the property during the 30–day abatement period.

### 2. Substantive Due Process

■ Official action violates an individual's substantive due process rights if it "is estab-

---

4. Plaintiffs do not argue that they did request a stay, but instead suggest that their attorney's "inquiries ... regarding whether the 30–day abatement period was stayed by virtue of Plaintiffs' appeal of the demolition orders was *tantamount* to a request to extend the abatement period." (Pls.' Mem. at 10) (emphasis added).

5. The issue here is not whether the Council should have "stayed" the 30–day period while the appeal was pending. Rather, the issue is whether there is any procedure in place to challenge being denied access to the property during the time frame allotted by the Council for the property owner to correct the problem identified in the notice. *See* 53 P.S. § 37322.

lished [that] 'the government's actions were not rationally related to a legitimate government interest' or 'were in fact motivated by bias, bad faith ·or improper motive.'" *Sameric Corp. of Delaware, Inc. v. City of Philadelphia,* 142 F.3d 582, 1998 WL 164874, *6 (3d Cir.) (quoting *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 692 (3d Cir.1993) (internal citations omitted)); *see also Midnight Sessions,* 945 F.2d at 682.

▮ Plaintiffs argue that the demolition process *en toto,* including denial of access to the property, violated their substantive due process rights because it was motivated by racial prejudice against Scott and Homan. *See* (Pl.'s Mem. at 22). Specifically, Plaintiffs argue that the City acted arbitrarily, prompted by improper racial motivations, in keeping Plaintiffs off the property during the 30–day abatement period and beginning the bidding process for the demolition project prior to the end of the 30–day abatement period. Defendant responds that its actions during the demolition process were rationally related to a legitimate government interest and that there is no evidence of a racial motivation in any of the decisions of the Council.

We find that the City's actions were rationally related to the stated legitimate governmental interest. *See Midnight Sessions,* 945 F.2d at 683 ("the 'rational relationship' test is a legal standard applied by the court"). Both parties are in agreement that this was one of the largest fires in the history of the City of Reading and that the fire ravaged property was unsafe and should have been demolished. *See* (Scott Dep. at 20, 99, and 100) (Homan Dep. at 34–35). Therefore, the City's efforts to demolish the property, including denying access to the property, was rationally related to the legitimate government interest of protecting the health, safety, and welfare of the public. We must now review the evidence presented to determine if there is a genuine issue of material fact as to whether the City acted arbitrarily and irrationally because it had an improper racial motive. *See Id.* ("only question appropriate for jury resolution ... was

whether the City denied the applications due to some improper motive such as political motivation or racial animus").

After a thorough review of the facts presented by Plaintiffs, we can find no evidence of an improper racial motivation. The two strongest facts Plaintiffs have are that the City did not think Scott could perform the demolition work and that Plaintiffs were kept off the property for some of the 30–day abatement period.

Plaintiffs first argue that the City did not think Plaintiffs could clear the property because Scott was African–American. *See* (Dep. K. Scott at 107–09 and 120). However, when Scott was asked on what basis he made this allegation he could not point to any specific facts. (Dep. K. Scott at 108–110, 120). While, there is evidence in the record to support Plaintiffs' contention that the City did not think Scott could perform the demolition work. Robert Ludgate ("Ludgate"), the combined City Engineer and Public Works Director from March of 1995 through September of 1996, stated in deposition that in some of the discussions among the City, "there was a strong presumption that this was a big job and it was beyond the expectations that someone without substantial assets, whether individual assets or corporate assets or something, was going to be able to undertake it." (Ludgate Dep. at 20–21). Additionally, Linton indicated that it was probably discussed both with the Mayor and other members of the Board whether Scott could perform the work. *See* (Linton Dep. at 22–29). This evidence suggests that the City questioned whether Scott was capable of effectuating the demolition of the property.[6] However, even taking this information as true and giving every favorable inference to the Plaintiffs, this shows that the City was concerned that Plaintiffs may not be able to clean up the property, but it does not demonstrate that this fear or belief is based on the race of Scott or his inter-racial relationship with Homan.

Further, although there is evidence to suggest that Plaintiffs may have been kept off

---

**6.** Scott himself admits that he had never done any demolition work and that this was a big job. *See* (Scott Dep. at 15 and 63). Further, Scott

never obtained a demolition permit, which would have given him six (6) months to clean up the property.

the property for at least some of the 30–day abatement period, Plaintiffs have not produced any evidence to demonstrate that this was due to an improper motivation based on Scott's race or his relationship with Homan. *See Sameric,* 142 F.3d 582, 593, 1998 WL 164874 at *10 (recognizing that although zoning board's decision may have been motivated by considerations not allowed under state law, such motivation was not improper under substantive due process law, thus was not a material fact); *cf. Bello v. Walker,* 840 F.2d 1124, 1129 (3d Cir.1988) (finding genuine issue of material fact concerning improper motive in substantive due process violation where various members of the council admitted in conversations that they had been pressured to hinder Plaintiffs' multi-unit housing development due to participation of a specific person).

The evidence presented is insufficient for a reasonable jury to conclude that the City's actions during the demolition process were motivated by improper racial considerations. Therefore, Defendant's motion for summary judgment will be granted on Plaintiffs' substantive due process.

### B. Count III: Equal Protection

■ Plaintiff states a claim for selective enforcement in Count III of the complaint. A plaintiff may recover on this claim if it can be established that:

(1) the person, compared with others similarly situated, was selectively treated, and

(2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional

rights, or by a malicious or bad faith intent to injure the persons.

*Zahra v. Town of Southold,* 48 F.3d 674, 683 (2d Cir.1995). Each prong of the test is to be applied separately and "failure to satisfy either inquiry [is] fatal to the plaintiff's claim." *A.B.C. Home Furnishings, Inc. v. Town of East Hampton,* 964 F.Supp. 697, 702 (E.D.N.Y.1997).

■ Plaintiffs argue that the ordinances were selectively enforced against them in both declaring the property a nuisance after the fire [7] and in not treating Caucasian owners of similarly situated properties in a similar manner. Plaintiffs argue that the selective treatment was motivated by racial considerations spurted by the inter-racial relationship between Homan and Scott.[8] We will examine the sufficiency of the summary judgment evidence based on Plaintiffs' allegations of selective enforcement of city ordinance motivated by race.

### 1. Selective Enforcement

Plaintiffs argue that the following properties are similarly situated yet were treated differently from Plaintiffs' property: 1) American Chain and Cable; 2) Reading Gray Iron; 3) Reading Recycling; 4) Argo Furniture Manufacturing; and 5) Dick Brothers. Specifically, Plaintiffs argue that while the record reflects that many of these property owners were issued orders to rehabilitate or demolish the properties, the property owners did not comply with these orders and yet the City did not either declare these properties public nuisances and/or demolish the buildings of their own accord. Further, Plaintiffs argue that they were treated differently from these other properties both in the bidding process for demolition of the property and in

---

7. The Court will not address the declaration of the property as a public nuisance since the issue has been mooted by Scott and Homan's deposition testimony in which they both agreed that the property should have been declared a public nuisance and demolished. *See* (Scott Dep. at 20) and (Homan Dep. at 34–35).

8. Again Plaintiffs attempt to argue that the selective treatment was motivated by bad faith by alleging that the City of Reading selectively enforced the ordinances in an attempt to obtain

Plaintiffs' property for use as a parking lot. However, as stated previously, the Court directed Plaintiffs to amend the complaint if they desired to continue to argue this theory, which was first alleged in response to defendants' 12(b)(6) motion. However, rather than take the opportunity to amend the complaint under Fed.R.Civ.P. 15, Plaintiffs simply deny the need to do so and continue to make arguments on this theory. We will not consider these allegations as they are not properly plead. *See* 963 F.Supp. at n. 4.

the liens for the demolition costs that were placed on their property.

Assuming *arguendo* that Plaintiffs have established a genuine issue of material fact to satisfy prong one, Plaintiffs must still satisfy the second prong of this analysis to overcome Defendant's motion for summary judgment. *See Barnes Foundation v. Township of Lower Merion,* 982 F.Supp. 970, 986 (E.D.Pa. 1997) ("proof of racially disproportionate impact ... would not be enough, standing alone, to support the inference of purposeful discrimination because the Defendant's actions are explainable on grounds other than race"); *see also Crowley v. Courville,* 76 F.3d 47, 53 (2d Cir.1996) ("a demonstration of different treatment from persons similarly situated, without more, would not establish malice or bad faith"); *Zahra,* 48 F.3d at 684 (" 'equal protection does not require that all evils of the same genus be eradicated or none at all' ").

### 2. Improper Motivation

Plaintiffs argue that racial animus motivated the selective enforcement. To show a racial motivation, Plaintiffs must demonstrate that the selective enforcement of the statute was "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *See Barnes Foundation,* 982 F.Supp. at 984. Because the City of Reading's challenged actions are explainable on grounds other than race, that is, that they were attempting to protect the health, safety, and welfare of the public from the fire damaged property, it is not enough for the Plaintiffs to simply show that they were treated differently than similarly situated property owners who were not African–American or who were not involved in interracial relationships. *See Id.* at 986; *see also Crowley,* 76 F.3d 47, 53 (2d Cir.1996); *Zahra,* 48 F.3d at 684. Rather, Plaintiffs must demonstrate "circumstantial evidence, beyond evidence of the simple fact of differential treatment itself, from which a jury could reasonably infer that the [defendant's] actions were actually motivated by a racially discriminatory purpose." *Barnes Foundation,* 982 F.Supp. at 986 (internal citations omitted); *see Zahra,* 48 F.3d at 684 (grant-

ing summary judgment where, although plaintiff may have been able to show it was treated differently, there was no evidence that such different treatment was motivated by maliciousness or bad faith); *cf. LaTrieste Restaurant and Cabaret Inc. v. Village of Port Chester,* 40 F.3d 587, 590 (2d Cir. 1994) (denying summary judgment for equal protection claim where plaintiff not only showed that enforcing the 10 p.m. restaurant restriction was applied to them and not others, but also demonstrated evidence, in the form of statements from village officials, indicating that the regulation was applied against plaintiffs to stop topless dancing in their bar).

Evidence of discrimination to satisfy this claim can take the form of a "clear pattern, unexplainable on grounds other than race;" "[t]he historical background of the decision ... particularly if it reveals a series of official actions taken for invidious purposes;" "[t]he specific sequence of events leading up [to] the challenged decision;" "[d]epartures from the normal procedural sequence;" or "[s]ubstantive departures." *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266–67, 97 S.Ct. 555, 564–65, 50 L.Ed.2d 450 (1977). This list is not intended to be exhaustive but is exemplary of the kinds of evidence that can be presented. *See Id.* at 268, 97 S.Ct. at 565.

Plaintiffs first attempt to argue that the City's actions regarding them is unexplainable on grounds other than an improper racial motivation. Plaintiffs argue that the property owners for those properties listed above are Caucasian and they were all given more time and opportunities than Plaintiffs to clear the properties and/or that the City has not acted to demolish these properties despite failure of the owners to rehabilitate or demolish. Plaintiffs offer as evidence that the "only obvious point of distinction between Plaintiffs and the owners of the other properties is that one of the Factory Store owners is Black." (Pls.' Sur Reply at 4). Thus, Plaintiffs argue "what else could it be" but racial animus. (Scott Dep. at 108–110). At most, however, this "evidence" merely shows that Plaintiffs' property was treated differ-

ently than other properties. However, as stated *supra*, in order to prevail on the selective enforcement claim here, Plaintiffs need to establish some other evidence, apart from the mere different treatment, from which a reasonable jury could infer that the Defendant's actions were due, at least in part, to an improper racial motivation.

In an attempt to establish a pattern of treating minority landowners differently, Plaintiffs proffer that, in addition to their building, the only other building for which the City rejected the appeal to demolish was owned by a woman who was Hispanic. However, the property owned by this woman is not similarly situated to Plaintiffs' property. This woman's property was a residential dwelling, not an abandoned warehouse. *See* (Board of Health Meeting Minutes, October 21, 1996); *Kirschner v. Zoning Board of Appeals*, 924 F.Supp. 385, 391 (E.D.N.Y. 1996) (quoting *The Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 19 (1st Cir. 1989) ("apples should be compared to apples")). Further, while Plaintiffs characterize Mrs. Gonzalez as Hispanic, they offer no evidence on the race of Mrs. Gonzalez.

· In short, after a thorough review of every document provided to the Court and every deposition transcript provided to the Court, there is no evidence from which a rational juror could find that the Defendant had an improper racial motivation to selectively enforce the law concerning abatement of public nuisances. Thus, we will grant Defendant's motion for summary judgment as to Plaintiffs' equal protection claim.

*III. Count IV: Section 1982*

 Section 1982 of Title 42 of the United States Code guarantees to all citizens of the United States "the same right ... as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold and convey real and personal property." 42 U.S.C. § 1982. In order to recover under § 1982, a plaintiff must demonstrate an intent to discriminate based on race. *See Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 616, 107 S.Ct. 2019, 2021, 95 L.Ed.2d 594 (1987); *Shipley v. First Federal S&L Ass'n of Delaware*, 703 F.Supp. 1122, 1134 (D.Del.1988) (Roth, J.),

*aff'd*, 877 F.2d 57 (3d Cir.1989); *Petrone v. City of Reading*, 541 F.Supp. 735, 739 (E.D.Pa.1982). Further, a person need not belong to a protected class to sue under the Fourteenth Amendment or federal civil rights statutes if her claim is that she suffered differential treatment because of her association with a member of a protected class. *See* 963 F.Supp. at 491.

Plaintiffs present only the same evidence we analyzed *supra* to support the § 1982 claim. As we have determined that this evidence is insufficient to allow a rational juror to infer a racially discriminatory purpose, motive, or intent, we will grant summary judgment on this claim as well.

## CONCLUSION

An appropriate Order follows.

## ORDER

AND NOW, this 29th day of July, 1998, upon consideration of Defendants' Motion for Summary Judgment and Plaintiffs' response thereto as well as the supplemental responses of the parties, it is hereby ORDERED that, in accordance with the foregoing Memorandum, the motion is GRANTED IN PART and DENIED IN PART as follows:

1) Defendant's Motion as to Count I, Plaintiffs' Procedural Due Process Claim, is GRANTED as to the Stay of the Abatement Period Claim and DENIED as to the Denial of Access to the Property Claim;

2) Defendant's Motion as to Count I, Plaintiffs' Substantive Due Process claim, is GRANTED;

3) Defendant's Motion as to Count III, Plaintiffs' Equal Protection Claim, is GRANTED;

4) Defendant's Motion as to Count IV, Plaintiffs' Section 1982 claim, is GRANTED.