Miguel Romero VALDIVIA and
Alleyne Maxine Valdivia,
Plaintiffs,

v.

CITY OF VILLISCA, a municipal cor-
poration, Warren Chapman, individu-
ally and in his official capacity as
Mayor, Tom McAlpin, Helen Lowe,
Janice Phillis, Andy Crussel, individu-
ally and in their official capacity as
members of the Villisca City Council,
Josiah C. Wearin, individually and in
his official capacity as attorney for
the City of Villisca, Defendants.

Civil No. 1:99–CV–30053.

United States District Court,
S.D. Iowa,
Western Division.

Aug. 1, 2001.

Eric Kenyatta Parrish, Parrish Kruidenier Moss Dunn Boles Gribble & Cook LLP, Des Moines, IA, for Plaintiffs.

Donna Renae Miller, Grefe & Sidney, Des Moines, IA, John Werner, Werner Law Office PLC, Toledo, IA, for Defendants.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

WALTERS, United States Chief Magistrate Judge.

This matter is before the Court on defendants' motion for summary judgment, filed May 15, 2001. Plaintiffs Miguel[1] and Alleyne Valdivia filed their complaint on November 1, 1999, bringing ten claims in four counts. Count I included three claims pursuant to 42 U.S.C. § 1983, alleging an unconstitutional taking of real property in violation of the Fifth and Fourteenth Amendments to the United States Constitution, and violations of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution, as well as three claims alleging the same violations with respect to parallel clauses of the Iowa Constitution. Counts II, III and IV alleged state common law claims of abuse of process, intentional infliction of emotional distress and tortious interference with existing or prospective contractual relations. Defendants originally moved to dismiss the complaint, which motion was ruled on by Chief Judge Ronald E. Longstaff. Judge Longstaff granted the motion with respect the federal and state constitutional claims of unconstitutional taking and violation of due process, but denied the motion with respect to the claimed violation of plaintiffs' federal and state constitutional equal protection rights and the state common-law claims. The remaining claims are founded on allegations that defendants discriminatorily enforced a "Dangerous Buildings Ordinance" against plaintiffs because plaintiffs are Hispanic. A building owned by plaintiffs was condemned and demolished as a nuisance.

Federal question jurisdiction is asserted. 28 U.S.C. §§ 1331 and 1343(a)(3). The Court has supplemental jurisdiction of the state law claims. 28 U.S.C. § 1367. The parties consented to proceed before a United States Magistrate Judge and the case was referred to the undersigned for all further proceedings on April 7, 2000. *See* 28 U.S.C. § 636(c).

### I.

Defendants' motion for summary judgment is subject to the following well-established standards. A party is entitled to summary judgment only when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Helm Finan-*

---

1. Mr. Valdivia has since died. On June 20, 2001, defendants filed and served a Statement of Death alerting the Court to the fact. No motion for substitution has been made. Fed. R.Civ.P. 25(a)(1). The action as to Mr. Valdivia is not yet subject to dismissal under the rule for failure of such a motion.

*cial Corp. v. MNVA Railroad, Inc.*, 212 F.3d 1076, 1080 (8th Cir.2000)(citing Fed. R.Civ.P. 56(c)); *accord Bailey v. USPS*, 208 F.3d 652, 654 (8th Cir.2000). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A genuine issue of fact is material if it "might affect the outcome of the suit under governing law." *Hartnagel*, 953 F.2d at 395 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *see Rouse v. Benson*, 193 F.3d 936, 939 (8th Cir.1999).

In assessing a motion for summary judgment a court must determine whether a fair-minded trier of fact could reasonably find for the nonmoving party based on the evidence presented. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *Herring v. Canada Life Assurance Co.*, 207 F.3d 1026, 1030 (8th Cir.2000). The court must view the facts in the light most favorable to the nonmoving party, and give that party the benefit of all reasonable inferences which can be drawn from them. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348; *accord Lambert v. City of Dumas*, 187 F.3d 931, 934 (8th Cir.1999); *Kopp v. Samaritan Health System, Inc.*, 13 F.3d 264, 269 (8th Cir. 1993).

## II.

The underlying facts in this case are not disputed. Plaintiffs have not filed a response to the Statement of Undisputed Facts filed by defendants in support of the motion and therefore by local rule the undisputed facts put forward by defendants are deemed admitted. LR 56.1(b). Plaintiffs do contend the facts are sufficient to support a finding of different treatment and inference of discriminatory motive in the enforcement of the city ordinance in question.

Plaintiffs Miguel ("Mike") Valdivia and Alleyne ("Maxine") Valdivia are Hispanic Americans residing in Nodaway, Iowa. (Complaint ¶ 6). In August 1993 they entered into a contract to purchase a two-story brick building located on the public square in Villisca, Iowa, a community about eight miles west of Nodaway. (*Id.* ¶ 17). At the time they purchased the building, they were aware that a crack existed in the mortar of the northwest corner and that they would have to perform repair work in the building. (App. 3, Ex. A, A. Valdivia Depo. at 6–8).

On December 9, 1993 the then Villisca Chief of Police, Allen Smith, spoke with Mike Valdivia about the corner. (App. 7, Ex. B). In 1993 or 1994 plaintiffs constructed temporary bracing of the northwest corner of the building. (App. 26, Ex. C, Trial Tr. at 54). Warren Chapman, then a member of the Villisca City Council, and later mayor, referred plaintiffs to Steve Adams of the Montgomery County Development Corporation. (App.34a, Ex. D(1), Chapman Depo. at 74). Adams assisted plaintiffs in researching possible grants to assist them in refurbishing their building. (App. 50, Ex. G, M. Valdivia Depo. at 25).

On April 10, 1995 Chief of Police Joe Bergen presented to the City Council proposed revised nuisance ordinances that he had requested City Attorney Joe Wearin prepare. The ordinances were "to enable the City to rid the town of abandoned mobile homes and provide stricter regulations regarding unsafe structures." The ordinances included the definition of a "driveway," replacement of the then-existing junk and junk vehicle ordinances, an ordinance creating a civil procedure to enforce the new ordinances with stiffer penalties, and an ordinance to repeal and amend the then-existing nuisance ordinance. The council took no action on the ordinances. (App. 60, Ex. H, 4/10/95

Council Minutes). On May 8, 1995, the council again considered the ordinances, and discussed several buildings that were considered dangerous and possible nuisances. The council came to the consensus that the existing ordinances were sufficient at that time, and new ordinances were not needed. (App. 65–66, Ex. I, 5/8/95 Council Minutes).

On July 10, 1995, a new dangerous buildings ordinance was considered by the City Council, presumably one of those proposed by Chief Bergen previously. Several buildings were discussed, but it was the consensus of the council that the then-existing ordinance was sufficient. (App. 82, Ex. J, 7/10/95 Council Minutes). City Council minutes reflect that at the August 14, 1995 council meeting "[m]uch discussion was held regarding properties in downtown Villisca that the City has received complaints about due to motor vehicles and conditions." Mayor Fred Burgess reported that letters would be sent to the property owners providing them time to correct the conditions and further action would be taken if the conditions were not remedied. (App. 86, Ex. K, 8/14/95 Council Minutes).

During this same approximate time period plaintiffs contacted Nancy Stillians for help in obtaining funding to restore their building. Stillians had an interest in preserving local historical buildings. (App.42–43, Ex. E). Stillians arranged for a structural engineer to inspect plaintiffs' building and to determine what measures needed to be taken to repair the northwest corner of the building. (App. 42–43, Ex. E, and App. 46–47, Ex. F).

The engineer, James Ebmeier, P.E., issued a report on September 22, 1995 explaining that "the reason for the review [of the building] was to determine the extent and potential solutions to the settlement of the northwest corner of the structure." Mr. Ebmeier concluded that "the north-

west corner of the structure is experiencing distortion settlement." While Mr. Ebmeier noted that temporary shoring was in place to support the corner, he observed "that it appears that there is some movement still being experienced." It was his opinion "that steps be taken in the near future to structurally stabilize the corner of the building." (App.46–47, Ex. F). Ebmeier further reported:

In order to repair the structure it is felt the following steps be taken:

1. Remove brick approximately 7 feet to the south and 19′9″ to the east.

2. Reshore the corner utilizing columns farther away from the corner to allow excavation for new column footing.

3. Excavate near the corner to open an area to pour a new column footing approximately at the basement floor level.

4. Pour in new basement walls to slightly above the level of the sidewalk.

5. Raise the upper floor to correct elevation and install a new steel column.

6. Replace brick and building's facial on first floor.

These construction efforts and the extent are due to several reasons:

1. The column footing needs to be placed at the basement floor due to the window in the basement wall, uncertainty of capability of the basement wall, and type of fill used when the stairs to the basement were filled in.

2. Removal of the brick is due to settlement and the existence of cracks and separation of the brick to other areas of the brick facade. Also, in order to raise the second floor the

brick would probably fail and fall down.

3. The column needs to be replaced due to the method of construction of the upper floor and its inability to cantilever to the corner of the structure.

(*Id.*) Plaintiffs did not perform any of the repairs recommended by Ebmeier until after September 1997 and then completed only three of the six repairs.

On November 13, 1995, the council again discussed the revised ordinances, including discussion about a single-family dwelling in town that was not hooked to the City's water or sewer, and had no electricity. The council was concerned because a family had moved into the house without the owner's knowledge. The council thereafter passed the Dangerous Buildings Ordinance (# 253) and the Junk Vehicles Ordinance (# 252). (App. 93–95, Ex. L, 11/13/95 Council Minutes and App. 97–110, Ex. M, Tr. 11/13/95 Council Meeting). Both were passed under the power to require the abatement of nuisances granted to Iowa cities by Iowa Code § 364.12(3) and specifically in the case of buildings, to "[r]equire the removal, repair or dismantling of a dangerous building...." *Id.* § 364.12(3)(c). Prior to the enactment of the Dangerous Buildings Ordinance, the Villisca city ordinances provided that nuisances were prohibited, and that the City could require of property owners "the removal, repair or dismantling of dangerous buildings or structures." (App.114–16, Ex. N).

The City received a number of complaints about the Valdivia's building over the years. In March 1993, June 1995 and October 1995, Villisca residents reported to the City Clerk their concerns about the safety of plaintiffs' building. Council members also received complaints. (App.29–30, Ex. D(1), Chapman Depo. I at 31, 43; App. 37, Ex. D(2), Chapman Depo.

II at 8; App. 119–22, Ex. O; and App. 221, Ex. KK, McAlpin Depo. at 12–13). The City Council became concerned about the City's liability for any injuries caused to pedestrians by bricks falling from plaintiffs' building. The council was aware that walls had recently fallen in other southwest Iowa towns. (App. 12, Ex. C, Trial Tr. at 13; App. 31, 34b, Ex. D(1), Chapman Depo. at 46, 81, 83, and App. 222, Ex. KK, McAlpin Depo. at 14).

In October 1995 Darwin Linn was notified by the City that he needed to remove a collapsed wooden building located on his property. The City subsequently filed a complaint in court and required Mr. Linn to sign an agreement detailing the cleanup and removal of the building. Mr. Linn subsequently removed the building and the City took no further action against him. (App. 177, Ex. BB; App. 40, 41, Ex. D(2), Chapman Depo II. at 38, 41, 50–53).

In June 1996 Mayor Chapman sought advice from city attorney Joe Wearin regarding how the council could proceed to force the removal or rehabilitation of plaintiffs' building and a house owned by Jeff Raines, a Caucasian property owner. (App.123, Ex. P). On July 8, 1996, the council discussed plaintiffs' building and agreed Mayor Chapman should "consult an engineering firm to inspect the property and make an estimate for repairs as it appears to be considered dangerous." (App.128, Ex. Q).

On September 3, 1996, two engineers from HGM Associates, Inc. accompanied Mike Valdivia in a visual inspection of plaintiffs' building. (App.130–32, Ex. R). The engineers identified the northwest corner of the building as the "most apparent problem" and noted that the temporary supports built by plaintiffs were possibly collapsing and causing the settling and cracking of the sidewalk as the result of the load applied to them by the tempo-

rary shoring. The engineers also found evidence of substantial roof problems, absence and deterioration of mortar to hold the bricks in place on the north and west walls and a portion of the south wall, and substantial bowing of the south wall. The engineers concluded that "the building in its current state is a hazard to occupants and the general public." (*Id.*) The engineers provided

> a list of the items which require repair to ensure the integrity of the building and the safety of the building occupants and the general public who may be passing by near the building.
>
> > Remove second story exterior wall at northwest corner
> >
> > Replace column at northwest corner, properly founded at or below basement level
> >
> > Replace second story exterior wall at northwest corner
> >
> > Replace the sidewalk slabs at the northwest corner of the building which were damaged due to load applied by the temporary column
> >
> > Tuck point entire West and North face of building
> >
> > Tuck point West 1/3 of South facing exterior wall.

(*Id.*) The engineers' opinion of the probable cost of these repairs, in addition to replacing the roof to protect the integrity of the building, was $76,500. (*Id.*)

On November 8, 1996 the City Council issued a Notice to Abate for plaintiffs' building. (Complaint ¶ 24). Plaintiffs filed a written request for a hearing on the notice, and a hearing was held on December 2, 1996 (*Id.* ¶ 27; App. 136, Ex. S). At the December 2 meeting, Mike Valdivia reported that he had installed a brace in the northwest corner of the building in 1993 to provide support and applied for grants but could not receive any as the ownership of the building was not in his name. He outlined the Valdivia' s "plans

for grant applications and stated a minimum of 45 days [was] required after receipt of the application for consideration for emergency funding." (App.138, Ex. T). The council granted plaintiffs until February 1, 1997 to request any extension of time to comply with the Notice to Abate, at which time the council would "seek assurance that adequate steps have been taken to seek grants or other financial assistance." (*Id.*)

Mike Valdivia appeared at the February 10, 1997 council meeting, listed the people he had contacted and assured the council that once the historic value of the building was proven, it would qualify for emergency grants. After discussion, the council approved an extension until March 10, 1997 for plaintiffs to comply with the Notice to Abate. (App.145, Ex. U).

At the March 10, 1997 council meeting, Mike Valdivia offered to sell the building to the City and reported he was filling out more grant papers and taking more pictures. He told the council a new law made it easier for any building over seventy-five years old to qualify for historical registry status. Mayor Chapman informed Mr. Valdivia no further extensions would be granted "due to city liability" and asked Valdivia keep the city attorney updated on the progress of building repair. (App.150, Ex. V).

In approximately May 1997 the City received complaints from the owners (or occupants) of the building that shared a common wall with plaintiffs' building, Dennis Black, Dixie Black, and Laverna Long. They reported that bricks from plaintiffs' building were falling on their roof, causing damage. (App.31, 32, Ex. D(1), Chapman Depo. I at 54–55; App. 38–39, Ex. D(2), Chapman Depo. II at 20, 28; and App. 119–22, Ex. O). Mayor Chapman directed Police Chief Russell Gray to investigate the complaints. Gray took pictures of

plaintiffs' building and the bricks that had fallen. (App. 14–15, Ex. C, Trial Tr. at 21–22,25; App. 27, Ex. 12; App. 31, Ex. D(1), Chapman Depo. I at 55–56 and App. 39, Ex. D(2), Chapman Depo. II at 28).

The Valdivias presented no further report on repairs or plans to repair and on September 2, 1997, the City filed a Petition to Abate Dangerous and Unsafe Building and Application for Writ of Mandatory Injunction and Appointment of Receiver in the Iowa District Court for Montgomery County. (Complaint ¶ 29). In their answer plaintiffs affirmatively stated they had done some repairs and were in consultation with architects and structural engineers with the intent of "keeping the structure . . . in a safe and habitable condition." (Answer, Div.I, ¶ 4). Plaintiffs also admitted, however, that they had inadequate financial resources to perform the work requested but affirmatively stated the building was not unsound nor did it constitute an immediate hazard. (*Id.*, Div. II, ¶ 4).

On October 14, 1997 a grant "pre-application" under the "Local Housing Assistance Program" was filed with the Iowa Department of Economic Development by Steve Adams, Executive Director of the Montgomery County Development Corporation. The "pre-application" listed plaintiffs' building as one of the many projects in need of funding. Attached to the "pre-application" was a letter from Mayor Chapman in support of the projects. (App.156–69, Ex. Y). This is the only application plaintiffs ever made for funds for the building, despite their representations to the contrary. (App. 3, Ex. A, A. Valdivia Depo. at 8 and App. 50, Ex. G, M. Valdivia Depo. at 25).

On October 17, 1997 the HGM engineers again inspected plaintiffs' building in an effort to evaluate plaintiffs' contractor's proposed plan to fix the building. Mike Valdivia had hired a contractor to begin making repairs. In their report the engineers noted that the contractor had removed the walls of the northwest corner, replaced the temporary shoring, and replaced the sidewalk that was settling. The engineers found, however, that the other three essential repairs identified in their October 2, 1996 report had not been performed by plaintiffs, nor had plaintiffs provided an adequate plan for repair of those items. (App. 170–72, Ex. Z and App. 17–23, 24–25, Ex. C, Trial Tr. at 28–34, 37–38). The open corner of the building allowed the engineers to view the interior of the wall, and they determined that the mortar was failing in all three layers of bricks. In addition, the engineers reported that the mortar around the bricks forming the building's parapet had completely deteriorated and the bricks could become dislodged and fall at any time. They opined that this situation required immediate attention. The engineers further found that the south wall was more hazardous than they had first reported, as the wall was inadequately anchored to the rest of the building. (App. 170–72, Ex. Z and App. 17–23, 45–25, Ex. C. pp. 28–34, 37–38).

A trial was held on the City's Petition on October 30, 1997. (App.8, Ex. C). The trial court agreed to wait to issue its order until November 17, 1997 to allow plaintiffs time to determine whether the grant pre-application submitted by Mr. Adams had been approved. Plaintiffs did not provide the court with evidence they would receive any grant money, and the court issued its ruling on November 17, 1997 (App.174–76, Ex. AA). In its ruling the court found

the building is in danger of collapse due to deterioration and lack of structural integrity and is therefore a hazard to occupants. The building is also a hazard to the general public due to bricks which occasionally fall from the exterior walls.

(App.174). The court found the property constituted a public nuisance because

a) The building is a menace and hazard to the public health, welfare, and safety by reason of deterioration and inadequate maintenance.

b) The building is structurally unsafe because of various inadequacies, including: dilapidation, deterioration, and decay; roof leakage; old mortar in brick walls; lack of maintenance and tuckpointing on brick walls; and bowing, movement, or displacement of certain walls.

(App.174–75). The court found the Valdivias had been "afforded reasonable opportunities by the [City] to correct the dangerous and unsafe condition of the building, but have, despite their best efforts, failed to make such corrections." (App.175). The court further found that plaintiffs did not have the financial ability to abate the nuisance by rehabilitating the building.

> [T]he Court remains unconvinced that [Valdivias] have the financial capability either to present adequate plans for abatement or to actually abate the nuisance by rehabilitating the building. As of this date, the copy of the grant application which was requested by the Court is unavailable. There appears to be no possibility that the [Valdivias] will ever have the resources needed to fully rehabilitate the building.

(*Id.*) The court directed an injunction be issued to abate the nuisance created by the building, ordered the City appointed as receiver for the purpose of eliminating the building, and ordered the receiver to demolish the building and remove the debris. A judgment in rem was entered for recovering the costs of demolition and removal of debris. (App.175–76). The building was subsequently demolished by the City.

III.

The summary judgment issue with respect to all counts turns on analysis of the equal protection claim. If the evidence is not sufficient to make out a case for selective prosecution based on plaintiffs' Hispanic ethnicity, there is no basis for recovery on the common law claims, all of which are based in whole or part on the alleged discrimination.

Intentional discrimination by a state actor for an arbitrary or irrational reason is actionable as a equal protection violation. The Equal Protection Clause protects not only against class-based discrimination, but also "arbitrary or irrational state action." *Batra v. Board of Regents*, 79 F.3d 717, 721 (8th Cir.1996). "[T]he relevant prerequisite is unlawful discrimination, not whether plaintiff is part of a victimized class." *Id.* The *Batra* court quoted Justice Frankfurter's concurrence in *Snowden v. Hughes*, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497 (1944), cautioning that cases speaking of "systematic discrimination" did not imply a limitation as such language was

> ... only a way of indicating that in order to give rise to a constitutional grievance a departure from a norm must be rooted in design and not derive merely from error or fallible judgment.

*Batra*, 79 F.3d at 721 (quoting *Snowden*, 321 U.S. at 15, 64 S.Ct. 397)(Frankfurter, J., concurring).

To be violative of equal protection discrimination must be intentional.

> The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination.

*Batra,* 79 F.3d at 721 (quoting *Snowden,* 321 U.S. at 8, 64 S.Ct. 397). *See Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) ("[p] roof of … discriminatory intent or purpose is required to show a violation of the Equal Protection Clause"); *Carpenter Outdoor Advertising Co. v. City of Fenton,* 251 F.3d 686, 690 (8th Cir.2001); *Brandt v. Davis,* 191 F.3d 887, 893 (8th Cir.1999).

■ As noted, plaintiffs claim the City, its mayor, council members and attorney, discriminatorily enforced the City's Dangerous Building Ordinance against them because they are Hispanic. The ordinance is facially neutral.[2] To establish their federal equal protection claim plaintiffs must first make a threshold showing that they were treated differently than others who were similarly situated to them, *Keevan v. Smith,* 100 F.3d 644, 647–48 (8th Cir.1996)(citing *Klinger v. Dep't of Corrections,* 31 F.3d 727, 731 (8th Cir.1994), *cert. denied,* 513 U.S. 1185, 115 S.Ct. 1177, 130 L.Ed.2d 1130 (1995)). They must then produce sufficient evidence to show that "the enforcement was motivated by a discriminatory purpose." *United States v. Bell,* 86 F.3d 820, 823 (8th Cir.), *cert. denied,* 519 U.S. 955, 117 S.Ct. 372, 136 L.Ed.2d 262 (1996); *see Homan v. City of Reading,* 15 F.Supp.2d 696, 702–03 (E.D.Pa.1998); *Martel v. City of Newton,* 6 F.Supp.2d 1243, 1248 (D.Kan.1998); *Barnes Foundation v. Twnshp. of Lower Merion,* 982 F.Supp. 970, 983–85 (E.D.Pa. 1997).

Iowa courts analyze claims arising under the parallel provision of the Iowa Constitution in the same fashion. *Sherman v. Pella Corp.,* 576 N.W.2d 312, 317 (Iowa 1998); *Suckow v. NEOWA FS, Inc.,* 445 N.W.2d 776, 778 (Iowa 1989).

*Others Similarly Situated*

Villisca is a small town of about 1350 people.[3] This itself limits the similarly situated property owners with whom plaintiffs might compare themselves. In resisting the motion for summary judgment plaintiffs appear to identify four similarly situated buildings they claim were treated differently: the Darwin Linn building; the two Janice Phillis buildings; and the Honeyman Drugstore building. They contend more generally that there were other equally dilapidated buildings. This evidence supplies only meager support for disparate treatment.

Darwin Linn owned a one-story wooden building which had once been part of an implement dealership located across an alley from the Valdivia building. (Pl.Ex. 7, McAlpin Depo. at 26, 34). It was not on the town square. (*Id.* at 34). The building collapsed. (Pl.Ex. 6, Chapman II Depo. at 40; Pl.Ex. 7, McAlpin Depo. at 26). What caused its collapse is not clear from the record but it is reasonable to infer it had deteriorated over time to the point of collapse. There is no evidence that the individual defendants knew about the condition of the building prior to its collapse or that the City Council had received complaints about the safety of the

---

**2.** Plaintiffs suggest the enactment of the ordinance was targeted at them because they are Hispanic. Plaintiffs' property may have been one of those the City Council had in mind when it discussed the ordinance, the record is not clear, but there is no evidence a discriminatory purpose prompted the legislation any more than it did its enforcement. The Dangerous Buildings Ordinance did not add substantively to the municipal power the City had

at all relevant times under Iowa law to require the removal of a dangerous building as a means of abating a nuisance. *See* Iowa Code §§ 364.12(3)(c), 657A.1, .2 (1995), (2001).

**3.** U.S. Census Bureau, Profiles of General Demographic Characteristics, 2000 Census of Population and Housing—Iowa, (Issued May 2001).

building. In October 1995 (prior to adoption of the Dangerous Building Ordinance) Linn was notified by the City that the collapsed building needed to be removed. Linn was slow in doing so and the City sued him. As a result of this Linn paid a small fine and signed a written agreement concerning the cleanup, which he accomplished. (Pl.Ex. 6, Chapman II Depo. at 38–41). The City took no further action against him. There are significant differences between the circumstances pertaining to the Linn building and the building owned by the Valdivias. The Linn building was not on the square. It was not occupied (a portion of the Valdivia building was leased to a pizza restaurant, the basis for plaintiffs' interference with contract claim). It came to the attention of the City Council after it collapsed. The concern articulated with respect to the Valdivia building, bricks falling on the sidewalk and an adjacent single-story building, did not pertain to the Linn building. There is no evidence that Linn's building was a hazard to passersby or adjacent structures. Though Linn was not required to abate a nuisance prior to the collapse of his building, once it was down the City required him to remove it.

Defendant Janice Phillis owned two buildings in Villisca. Phillis testified that the first building had to be fixed up before walls, the floor, put in a bathroom, a new ceiling and lighting. (Pl.Ex. 1, Phillis Depo. at 9). Interior walls were crumbling because the plaster was old. (*Id.*) The repairs were made promptly after Phillis and her husband acquired the building and there is no evidence that it was a dangerous building.

Phillis and her husband sold the second building they owned to the Honeymans after the Honeyman Drugstore had a fire. (*Id.* at 11). When Phillis and her husband bought that building they fixed it up by painting it and repairing the ceiling before the tenant moved in, but again there is no evidence that the building at any time was a nuisance. (*Id.* at 13).

The Honeyman drugstore building had a fire at some point. The fire affected the inside of the building, not the walls or roof. (Pl.Ex. 6, Chapman II Depo. at 65). The building was vacated and repairs began immediately. (*Id.* at 64–65). Defendant Chapman thought the fire marshal had inspected the building. (*Id.*) A vacant, burned out building can be a nuisance, but here the property owner took steps immediately after the fire to make repairs. No enforcement action is necessary where an owner promptly takes steps to voluntarily abate a nuisance.

In addition to these buildings, plaintiffs state that they took photographs of a number of other buildings in Villisca which they contend were in similar disrepair. The photographs are not in the summary judgment record. The only reference to the other buildings in the portion of Mr. Valdivia's deposition in the record is his testimony that the roof on a senior citizen community center was caving in and the corner of the theatre was falling down. (App. 53, Ex. G, M. Valdivia Depo. at 52–53). Both conditions were repaired and there is no evidence of complaints being made about these buildings.

It is doubtful that the brief and, for the most part, general references in the record to other buildings is sufficient to demonstrate that other similarly situated property owners were treated differently. However, as the issue is before the Court on a summary judgment motion it is appropriate to pass on to examine the evidence of motive.

*Discriminatory Purpose*

 The findings of the Iowa District Court establish that the Valdivias' building was in danger of collapse, presented a hazard both to occupants of the building

and to the general public from falling bricks, that rehabilitation was not financially feasible, and demolition of the building was the only appropriate method for abatement of the nuisance presented by the building. Defendants therefore had a valid basis in fact to seek demolition of the building. There is no direct evidence of discriminatory purpose.[4] As a consequence plaintiffs must identify circumstantial evidence from which the jury could reasonably infer that the abatement proceedings against them were also motivated in part by a discriminatory purpose. *See Bell,* 86 F.3d at 823; *Homan,* 15 F.Supp.2d at 703.

■■■ "Because discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Cravens v. Blue Cross & Blue Shield of Kansas City,* 214 F.3d 1011, 1016 (8th Cir.2000) (an employment discrimination case citing *Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994)). Plaintiffs focus primarily on the facts that they were the only Hispanic property owners in Villisca and theirs was the only building subject to abatement and condemnation proceedings under the Dangerous Buildings Ordinance. (Resistance at 2–3). Being a member of a minority or disfavored group does not alone permit an inference of intentional discrimination. *See Hedges v. Poletis,* 177 F.3d 1071, 1076 (8th Cir.1999). That plaintiffs' building was the subject of the lone prosecution under the ordinance likewise does not support such an inference. More than different treatment is required to prove unlawful intent.

*See Arlington Heights,* 429 U.S. at 266, 97 S.Ct. 555; *Batra,* 79 F.3d at 721.

The slight evidence of different treatment is particularly lacking in probative value because, as the Iowa District Court found, there were neutral, legitimate safety reasons to demolish the building. *See Homan,* 15 F.Supp.2d at 703. No other circumstantial evidence is identified which arguably supports an inference of discriminatory motivation on the part of any defendant, indeed it is to the contrary. The City had received complaints about the building for a number of years. Bricks had fallen off the building to areas where pedestrians walked and onto the roof of an adjoining building causing damage. Prior to issuance of the notice to abate the nuisance, the City hired an engineering firm to inspect the building. The engineers reported that the building was a hazard to both occupants and the general public as bricks and other material were falling from the building and the corner of the building was in danger of collapsing. Following issuance of the notice to abate the City Council, at plaintiffs' request, granted two extensions of time for compliance. More than a year passed between the notice and final court action. While court proceedings were pending defendant Chapman, the City's mayor, wrote in support of the "pre-application" for local housing assistance funds to help rehabilitate the Valdivias' building. In fact, earlier Chapman had contacted the Montgomery County Development Corporation to ask that they help the Valdivias obtain funds to fix the building. With the City's agreement, the expenses for demolition of the

---

**4.** Plaintiffs testified in their depositions that they had been told by others in the community that the City was discriminating against them. What others may have told the Valdivias about the City's motivation is both hearsay and in all probability inadmissible opinion testimony not based on personal knowledge.

At the conclusion of his deposition defendant McAlpin testified the Valdivias looked Caucasian. (Pl.Ex. 7, McAlpin Depo. at 38). Plaintiffs' counsel argues this shows insensitivity on McAlpin's part, and perhaps it does, but it is not direct evidence of discriminatory intent.

building were taxed against the real estate, not the Valdivias personally. All of this is against any inference of purposeful discrimination or other malignant intent, and supportive of a conclusion that defendants acted for the legitimate municipal objective of protecting public safety.

In sum, plaintiffs have not identified any evidence from which a rational fact-finder could reasonably find that enforcement of the Dangerous Buildings Ordinance against them by defendants was motivated in part by the fact that they are Hispanic. In the absence of evidence of discriminatory intent there could be no basis under plaintiffs' theory of the case for the jury to find an improper purpose required to establish abuse of process, outrageous conduct to support a claim for intentional infliction of emotional distress, or improper interference with plaintiffs' contractual relationship with the building tenant to support a claim of intentional interference with a contract.[5]

### IV.

Defendants' motion for summary judgment is granted as to all remaining counts. The Clerk of Court shall enter judgment dismissing the complaint.

IT IS SO ORDERED.

---

**5.** The Court has assumed, without deciding, that evidence of a discriminatory motive in the enforcement of the Dangerous Building Ordinance would avoid summary judgment on the common law counts.